**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| F.F. (MINOR) *et al*, | : | CIVIL ACTION |
| Plaintiffs, | : | |
| | : | |
| vs. | : | |
| | : | |
| PETSMART LLC *et al*, | : | No. 24-6279 |
| Defendants. | : | |
| | : | |

**<u>Memorandum Opinion</u>**

**PAMELA A. CARLOS**                                              **MARCH 30, 2026**
**U.S. MAGISTRATE JUDGE**

Marguerite Faulckes, and her granddaughter, F.F. ("Ms. Faulckes," "F.F." and, with Danielle Chappell (on behalf of F.F.) and Kurt Clawson[1], hereinafter collectively "Plaintiffs"), were denied service at a PetSmart store on March 14, 2024. Alleging racial discrimination in violation of 42 U.S.C. § 1981, intentional infliction of emotional distress, negligent infliction of emotional distress, and loss of consortium, Plaintiffs sued PetSmart LLC ("Petsmart") and Elizabeth Palumbo, a PetSmart employee (hereinafter collectively "Defendants"). Before the Court is defendants' Motion for Summary Judgment.  For the following reasons, the defendants' Motion is granted in part and denied in part.

---

[1] Mr. Clawson is incorrectly identified as Kurt Lawson on the docket. During a telephonic status conference, the Court confirmed Plaintiff's name is Kurt Clawson.

## I.  BACKGROUND

### A.  Factual Background

The parties agree as to the following: on March 14, 2024, Ms. Faulckes and her maternal granddaughter, F.F., attempted to purchase a fish at Defendant PetSmart's King of Prussia, Pennsylvania location. (Doc. No. 19 at 2-3; Doc. No. 20-5 at 13-14; Doc. No. 1-5 at 5-6). F.F. was three years old. (Doc. No. 19 at 2; Doc. No. 1-5 at ¶ 28.) Ms. Faulckes and F.F. approached Ms. Palumbo. (Doc. No. 19-1 at 3; Doc. No. 20-1 at 4.) Ms. Faulckes and F.F. are African American. (Doc. No. 19 at 2; Doc. No. 20-1 at 1.) Ms. Palumbo is Caucasian. (Doc. No. 19-1 at 14.)  Ms. Palumbo refused to sell Ms. Faulckes and F.F a goldfish. (Doc. No. 19 at 3; Doc. No. 20-5 at 14.) Ms. Faulckes and F.F. then left the store and lodged a complaint with PetSmart's corporate office. (Doc. No. 19-1 at 4; Doc. No. 20-5 at 26.) Danielle Chapell is F.F.'s mother and Ms. Faulckes' daughter. (Doc. No. 1-5 at 3.) Kurt Clawson is Ms. Faulckes' husband. (*Id.*) The parties disagree as to the nature and scope of the interaction between Ms. Faulckes, F.F., and Ms. Palumbo.

### 1.  Plaintiffs' Facts

According to Plaintiffs, Ms. Faulckes and F.F. entered the store and looked at dog toys, before walking to the fish tanks at the back of the store. (Doc. No. 20-5 at 13-14.) There, a young Caucasian man directed them to the aisle with fish accessories. (*Id.* at 17-18.) They selected a fish tank and a three-to-four-inch sized bag of goldfish food. (*Id.* at 15, 19-20.) The tank had "a little handle" and "was kind of odd shaped [like] a portable fish carrier." (*Id.* at 19.) While Ms. Faulckes does not remember the tank's label, she is certain it did not say "critter," nor did it look like a "critter cage," a portable habitat for non-aquatic animals. (*Id.* at 19, 22, 24.)

After picking out a tank and food, Ms. Faulckes and F.F. waited for Ms. Palumbo to finish assisting a male customer, who was holding a "big plastic bag of fish." (Doc. No. 20-5 at 14.) Ms. Faulckes represents she approached Ms. Palumbo and said, "Excuse me. We're here to buy a goldfish for my granddaughter," as she gestured at the goldfish. (*Id.*) Ms. Palumbo had "a look of disgust" and turned "beet red," according to Ms. Faulckes, before responding "I'm not serving you people anything because you're not going to take care of it." (*Id.*; Doc. No. 20-1 at 4; Doc. No. 20-3 at 5.) Ms. Faulckes described twice asking for clarification, and Ms. Palumbo repeating the same statement. (Doc. No. 20-5 at 15.) During this interaction, Ms. Faulckes recalled that F.F. began crying and wanted to know why they could not purchase a fish. (*Id.* at 28.)

Ms. Faulckes requested to speak to a manager and Ms. Palumbo responded she was the manager. (Doc. No. 20-5 at 15.) At this point Ms. Faulckes asked Ms. Palumbo to write her name down. (*Id.*) Ms. Faulckes also noted another customer, closer to the bird section of the store, observed the interaction. (*Id.* at 15-16.) Per her recollection, the interaction lasted no more than two minutes. (Doc. No. 20-1 at 4.) Ms. Faulckes and F.F. then left the store, before briefly returning to ask for the store number to report the incident to PetSmart's corporate office. (Doc. No. 20-5 at 16.) Ms. Faulckes returned to the store a third time and spoke to a woman at the cashier desk to register her frustration at the denial of sale. (*Id.* at 27-28.)

Ms. Faulckes represents she did not speak to any employee about how she planned to house the fish, nor did she speak with any employee, including Ms. Palumbo, about the welfare or care of the fish. (*Id.* at 22.) Ms. Faulckes concedes Ms. Palumbo did not explicitly mention Ms. Faulckes' and F.F.'s race. (*Id*. at 24-25.) Ms. Faulckes also agrees that Ms. Palumbo did not say she was unwilling to sell them a fish because of their race. (*Id.*)

3

### 2. Defendants' Facts

Defendants dispute Plaintiffs' version of events almost entirely, alleging that, after Ms. Faulckes approached Ms. Palumbo, Ms. Palumbo asked if Ms. Faulckes and F.F. already had a fish tank or if they needed help picking one out. (Doc. No. 19-1 at 6.) Ms. Faulckes responded they did not own one and asked where fishbowls were kept. (*Id.*) Ms. Palumbo pointed them to the fish tank aisle, and Ms. Faluckes and F.F. walked to the aisle. (*Id.*)

Minutes later, Ms. Faulckes and F.F. returned. (*Id.*) F.F. was holding a critter tote and did not have fish food. (*Id.* at 7.) Ms. Palumbo then said a critter tote could not hold a fish, and she would not sell them a fish if they intended to house it in the critter tote, saying "you guys don't seem like you would have a proper setup and take care of the fish properly." (*Id.*; Doc. No. 19-3 at 71.) Ms. Faulckes responded she did not need the fish to live long, at which point Ms. Palumbo refused to sell them a fish. (*Id.*) In reaction, Ms. Faulckes "raised her voice," at Ms. Palumbo. (*Id.* at 8.) Ms. Palumbo then provided her information to Ms. Faulckes. (*Id.*) Ms. Palumbo recalls the exchange as lasting between two to five minutes. (*Id.* at 7.)

### B. Procedural History

Plaintiffs initiated their lawsuit on October 25, 2024, in the Philadelphia Court of Common Pleas. (Doc. No. 1-5 at 23.) It was removed to this Court on November 22, 2024. (Doc. No. 1 at 2.) Plaintiffs bring fourteen claims. (Doc. No. 1-5 at 7-23.) F.F., through Danielle Chappell, asserts violations of 42 U.S.C. § 1981, intentional infliction of emotional distress, and negligent infliction of emotional distress against Defendants. (*Id.*) Ms. Faulckes likewise brings 42 U.S.C. § 1981, intentional infliction of emotional distress, and negligent infliction of emotional distress claims. (*Id.*) Kurt Clawson alleges a loss of consortium claim (*Id.*) Defendants filed the instant motion, seeking summary judgment on all counts, on September 15, 2025. (Doc No. 19.)

Plaintiffs responded, and following Defendants' reply and Plaintiffs' sur-reply, the motion is ripe for disposition. (Doc. Nos. 20, 22, 24.)

## II.   STANDARD OF REVIEW

Summary judgment is appropriate only in cases where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those that "might affect the outcome of the suit under the governing law." *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). At the summary judgment stage, the facts and evidence are viewed in "the light most favorable to the nonmoving party." *Razak v. Uber Technologies, Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

The moving party has the initial burden of showing an absence of a genuine dispute as to any material fact. *See Anderson*, 477 U.S. at 256. This includes any argument that there is no evidence to support an essential element of the nonmoving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). After the movant has made this initial showing, the burden then shifts to the nonmoving party to demonstrate that there is sufficient evidence in the record that would support a jury verdict in their favor. *See id.* at 322–23. Importantly, speculation and conclusory allegations by the nonmoving party are not enough to defeat a summary judgment motion. *Razak, Inc.*, 951 F.3d at 144.

### III.    DISCUSSION

### A.  1981

Section 1981 ensures "all persons ... shall have the same right ... to make and enforce contracts ... [as] enjoyed by white citizens." 42 U.S.C. § 1981. To be afforded relief under § 1981, a plaintiff must show: "(1) that he belongs to a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in § 1981, including the right to make and enforce contracts." *Pryor v. Nat'l Collegiate Athletic Ass'n.,* 288 F.3d 548, 569 (3d Cir. 2002) (quotations and citations omitted); *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006) (noting "§ 1981 protects the would-be contractor").[2]  Typically, § 1981 arises in the employment contract context, although courts have recognized that the statute extends to refusal of service in retail transactions. *See, e.g., Morris v. Off. Max, Inc.*, 89 F.3d 411, 413 (7th Cir. 1996); *Perry v. Petco Animal Supplies Stores, Inc.*, No. 07-2281, 2008 WL 11417088, at *3 (N.D. Ga. Mar. 27, 2008) ("[C]ourts have consistently required customer-plaintiffs to show that they were actually prevented from making their purchase before recognizing a § 1981 claim.")

A defendant's discriminatory intent may be shown through direct or indirect evidence. *Doe v. Apria Healthcare Grp. Inc.*, 97 F. Supp. 3d 638, 642 (E.D. Pa. 2015). "[D]irect evidence of discrimination does not require a fact finder to draw any inferences in order to conclude that the challenged ... action was motivated at least in part by prejudice against members of the protected group." *Anderson v. Wachovia Mortg. Corp.*, 609 F. Supp. 2d 360, 367 (D. Del. 2009), *aff'd*, 621

---

[2] Plaintiffs assert the first and third elements are met. (Doc. No. 20-1 at 9.) ("Plaintiff Marguerite Faulckes and Plaintiff F.F. satisfy the first element of the prima facie case because they are African-American and black by color. The third element exists because plaintiff Marguerite Faulckes has the right to make and enforce contracts.").) Defendants do not challenge either element, arguing only that Plaintiffs are unable to show intent to discriminate. (*See* generally Doc. No. 19.)

F.3d 261 (3d Cir. 2010) (citations omitted). In the absence of direct evidence, courts utilize the

*McDonell Douglas* three-step burden shifting framework. *Apria Healthcare Grp. Inc.*, 97 F.

Supp. 3d at 642; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973); *Anderson*,

621 F.3d at 268. At the first step, Plaintiff must establish a prima facie case by "produc[ing]

some evidence that would [defendant] intentionally discriminated against her because she

belonged to an 'identifiable class[ ] of persons who are subjected to intentional discrimination

solely because of their ancestry or ethnic characteristics.'"[3] *Pamintuan v. Nanticoke Mem'l*

---

[3] Neither party addresses the elements of a prima facie case in the retail context. (Doc. No. 19-1 at 13 ("Plaintiffs must establish a prima facie case of racial discrimination"); Doc. No. 20-1 at 13-14 (suggesting comparator evidence can establish a prima facie case) (citing *Burns v. Seaworld Parks & Ent., Inc.*, 675 F. Supp. 3d 532, 544 (E.D. Pa. 2023).) It is worth considering the function and statutory context of the burden-shifting framework to understand why this presents a challenge, under these facts. *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 411 (3d Cir. 1999) ("The elements of a prima facie case depend on the facts of the particular case [and] cannot be established on a one-size-fits-all basis.").

        Under *McDonell Douglas*, an employment case, a plaintiff must show the following to establish a prima facie case:

1.     that he belongs to a racial minority;
2.     that he applied and was qualified for a job for which the employer was seeking applicants;
3.     that, despite his qualifications, he was rejected; and
4.     that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). This framework has been modified, often by altering the first element, where an employee seeks to sue for other types of discrimination under Title VII. *See Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013) (age and gender); *Smith v. City of Allentown*, 589 F.3d 684, 692 (3d Cir. 2009) (political affiliation); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007) (disability). Likewise, the *McDonell Douglas* framework has been used under other statutes, including § 1981. *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d at 412. However, as here, not all § 1981 claims arise in the employment context. *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 275 (3d Cir. 2010) (lending discrimination); *Taliaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181, 186 (3d Cir. 2006) (zoning and licensing); *Pryor v. Nat'l Collegiate Athletic Ass'n.*, 288 F.3d 548, 552 (3d Cir. 2002) (education). The Third Circuit, consequently, has announced tailored formulations of the prima facie case to better address the claims at issue in a particular case. *Anderson*, 621 F.3d 261 at 271, 275 ("We have not previously identified the elements of a prima facie case of lending discrimination…."). For example, in *Anderson*, the Court discussed whether a plaintiff must show comparator evidence or that a similarly situated person was treated differently in lending discrimination actions. *Anderson*, 621 F.3d 261 at 271-724. The Third Circuit found the comparator requirement can "be relaxed in certain circumstances," including lending discrimination because, unlike employment hiring, lending is "non-competitive," i.e., like retail, one customer is not refused a transaction in favor of another customer. *Id.* The Third Circuit has not addressed what elements a plaintiff must show for a § 1981 claim arising in the retail or commercial context. Therefore, the Court looks to other Circuits for guidance.

        Some Circuits require a plaintiff only to point to the three-part test for a § 1981 claim, in making out a prima facie case—membership in protected class, intentional discrimination in course of protected activity, and ability to

*Hosp.*, 192 F.3d 378, 385 (3d Cir. 1999) (quoting *St. Francis Coll. v. Al–Khazraji*, 481 U.S. 604, 609 (1987)); *McDonnell Douglas Corp.*, 411 U.S. at 802. If accomplished, the burden shifts to the defendant, who must proffer a legitimate non-discriminatory reason for the complained of action. *McDonnell Douglas Corp.*, 411 U.S. at 802. The burden, then, returns to the plaintiff who

---

contract. *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1101-02 (10th Cir. 2001) (using elements of 1981); *Green v. Dillard's, Inc.*, 483 F.3d 533, 538 (8th Cir. 2007) (holding same); *Morris v. Off. Max, Inc.,* 89 F.3d 411, 413 (7th Cir. 1996) (addressing only three-part § 1981 test without using burden-shifting). However, if *McDonnell Douglas* is used to establish evidence of the second element of a § 1981 —intentional discriminatory conduct in the making of a contract—and a prima facie case required showing only the elements of a § 1981, then the use of the prima facie case would seem redundant or circular. The Sixth Circuit addressed exactly this concern in adopting a distinct test. *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 868, 870 (6th Cir.) ("Clearly, a plaintiff asserting a § 1981 claim must prove intentional discrimination. But it does not follow that the plaintiff must prove intentional discrimination as an element of the prima facie case."). There, the Sixth Circuit endorsed the following test:

(1) plaintiff is a member of a protected class;
(2) plaintiff sought to make or enforce a contract for services ordinarily provided by the defendant; and
(3) plaintiff was denied the right to enter into or enjoy the benefits or privileges of the contractual relationship in that
    a) plaintiff was deprived of services while similarly situated persons outside the protected class were not and/or
    b) plaintiff received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory.

*Christian v. Wal-Mart Stores, Inc.*, 252 F.3d at 872.

On the other hand, the Fourth Circuit's formulation requires comparator evidence: "To establish a prima facie case of discrimination in a § 1981 cause of action relating to the purchase of goods or services, [Plaintiff] must establish that:

(1) he is a member of a protected class;
(2) he sought to enter into a contractual relationship with the defendant;
(3) he met the defendant's ordinary requirements to pay for and to receive goods or services ordinarily provided by the defendant to other similarly situated customers; and
(4) he was denied the opportunity to contract for goods or services that was otherwise afforded to white customers.

*Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004); *see also Don v. Equinox Brickell, Inc.*, No. 20-25322, 2022 WL 892394, at *14-15 (S.D. Fla. Mar. 16, 2022) (noting Eleventh Circuit has not announced retail specific test, but does require comparator evidence so court could not follow *Christian*). One of the only courts in this District to consider a retail claim similarly articulated the test: "the plaintiff must show that he is a member of a protected class; that he attempted to make, enforce or secure the performance of a contract; that he was denied the right to do so; and, that the opportunity to make, enforce or secure the performance of a contract for like goods or services remained available to similarly situated persons outside the protected class." *Singh v. Wal-Mart Stores, Inc.*, No. 98-1613, 1999 WL 374184, at *6 (E.D. Pa. June 10, 1999), *aff'd*, 225 F.3d 650 (3d Cir. 2000); *but see Anderson*, 621 F.3d 261 at 271-724 (noting comparator evidence is not always necessary).

Here, at summary judgment, Defendants' Motion, as explained, cannot be granted because there is a genuine dispute of material fact about the circumstances surrounding the encounter. Therefore, the Court, at this stage, has not endorsed one formulation of the prima facie case, and instead has considered whether there is a genuine dispute of material fact under all three tests. In doing so, the Court has determined, regardless of the test utilized, Plaintiffs and Defendants present entirely different reasons for the denial of service such that summary judgment would be inappropriate under any test.

8

must show the reason was pre-text for discrimination, meaning "[plaintiff] must show but-for causation and that retaliatory animus was the real reason." *Jarmon v. Trader Joe's Co.*, 660 F. Supp. 3d 357, 367 (E.D. Pa. 2023).

### 1. Direct Evidence

Defendants assert there is no direct evidence of discrimination, arguing allegations of difference in race and Ms. Palumbo's alleged use of the phrase "you people" are insufficient to establish racial animus. (Doc. No. 19-1 at 14-15 (collecting cases).) Although the briefing is not entirely clear, Plaintiffs seem to argue "you people" can constitute direct evidence. (Doc. No. 20-1 at 10-13. (citing *Kirt v. Fashion Bug 3253, Inc.*, 479 F. Supp. 2d 938, 950 (N.D. Iowa).) Ultimately, Defendants are correct – even accepting Plaintiffs' version of events as true, "you people" by itself is not, without an explicit mention of race, direct evidence of racial discrimination. (See Doc. No. 19-3 at 45-46 (acknowledging Ms. Palumbo did not mention their race).) *See, e.g., White v. Cmty. Care, Inc.*, No. 07-1507, 2008 WL 5216569, at *8 (W.D. Pa. Dec. 11, 2008) ("This case presents a rare instance of direct evidence. Plaintiff testified under oath that [plaintiff's supervisor] stated that she was denying her the […] position because she was [B]lack."); *Smith v. Allstate Corp.*, No. 12-0144, 2013 WL 990438, at *5 (E.D. Pa. Mar. 13, 2013) ("One's own subjective belief of discrimination, no matter how genuine, cannot serve as the basis for a finding of intentional discrimination.") (citations omitted). Therefore, the Court must evaluate the Motion under the *McDonell Douglas* framework.

9

### 2. McDonell Douglas Burden-Shifting Framework
###    a. Prima Facie Case

Plaintiffs argue the denial of sale, Ms. Palumbo's use of the phrases "you people" and "won't care for the fish," nonobservance of store policies,[4] refusal to explain the denial or call a store manager, and "failure to offer [...] alternatives" establish a prima facie case. (Doc. No. 20-1 at 9.)[5] Defendants respond these assertions necessarily require an assumption that racial animus underscored Ms. Palumbo's reactions. (Doc. No. 22 at 1.) Given the difference between Ms. Faulckes' recollection of the interaction and Ms. Palumbo's recollection, as captured in each party's briefing, the Court cannot grant summary judgment.

The parties agree only that Ms. Palumbo spoke with Ms. Faulckes and F.F, and that Ms. Palumbo refused to sell Ms. Faulckes and F.F. a fish, all other facts are disputed. (Doc. No. 19-1 at 4.) In Defendants' telling, Ms. Palumbo refused to sell Ms. Faulckes and F.F. a fish because Ms. Faulckes was unwilling to purchase the proper tank and told Ms. Palumbo she did not need to fish to live long. (Doc. No. 19 at 5-7.) Ms. Faulckes and F.F., on the other hand, represent they were denied service at the first instant, with no substantive explanation or exchange of information, and after a Caucasian customer was served, leading to their belief that race was the cause. (Doc. No. 20 at 4-5.) Taken together, Defendants and Plaintiffs disagree as to the

---

[4] Defendants' Motion outlines PetSmart's Anti-Discrimination policy, the PetSmart Mission Statement, and policies intended to promote animal welfare, including keeping and caring for fish. (Doc. No. 19-1 at 8-11.) Plaintiffs' Response discusses PetSmart's HEAR and HEART policies. (Doc. No. 20-1 at 5.) HEAR, an acronym for Hear, Emphasize, Apologize, and Resolve, is intended to help employees approach "difficult situations." (Doc. No. 20-6 at 2.) Plaintiffs allege Ms. Palumbo violated both this policy and the PetSmart mission statement during the interaction. (Doc. No. 20-1 at 5.)

[5] Plaintiffs seem to reference *McDonell Douglas*, and agree it applies, but do not set out their arguments under the three-step framework. (*See* Doc. No. 20-1 at 13 (citing *Burns* for proposition that Plaintiffs must establish prima facie case and can rebut legitimate non-discriminatory reason by showing pretext); *Id.* at 15 ("a violation of policies and procedures is circumstantial evidence of pretext.").) Therefore, instead of finding the arguments are waived, the Court has considered Plaintiffs' arguments as they logically apply within the requisite framework.

circumstances giving rise to the refusal of sale and, because the circumstances surrounding the denial of sale are material to establish indirect evidence of discrimination, summary judgment would be improper.  Accepting Plaintiffs' version of the interaction, however, the Court finds they have established a prima facie case, because Ms. Faulckes and F.F. were members of a protected class, they were denied the ability to purchase a fish, and they have claimed both that a Caucasian customer was able to purchase similar fish[6] and that they were denied service in a hostile manner. *Compare Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 872 (6th Cir.); *Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004); *Singh v. Wal-Mart Stores, Inc.*, No. 98-1613, 1999 WL 374184, at *6 (E.D. Pa. June 10, 1999).  Therefore, the analysis continues to the next step.

###### b.  Legitimate Non-Discriminatory Reason

In the alternative, Defendants offer a legitimate non-discriminatory reason for refusing service—Ms. Palumbo's concern for the welfare of the fish. (Doc. No. 19-1 at 17-18.) The Court finds this satisfies the Defendants' "relatively light burden." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). A reasonable jury could accept Ms. Faulckes was indifferent to the fish's lifespan and that was why Ms. Palumbo denied service. See *Christian v. Wal-Mart Stores, Inc.,* 252 F.3d

---

[6] There is even a dispute as to what kind of fish Plaintiffs sought to purchase. Ms. Faulckes recalled telling Ms. Palumbo they wanted to purchase a goldfish. (Doc. No. 19-3 at 37.) Based on the briefing, it seems Defendants sell feeder fish, or inexpensive fish meant to be fed to another kind of pet or to be kept as a pet, and fancy fish, more expensive fish exclusively kept as a pet. (Doc. No. 20-1 at 15.) Ms. Palumbo said Ms. Faulckes and F.F. pointed to the 29 cent to 49 cent Comet goldfish—the feeder fish. (Doc. No. 19-3 at 73.)  Plaintiffs' response is unclear as to the kind of fish they sought, accusing Ms. Palumbo of telling her co-workers that Plaintiffs wanted a fancy fish, when they, in fact, wanted a feeder fish. (Doc. No. 20-1 at 8 ("Ms. Palumbo wrote a statement that [Ms. Faulckes] wanted a feeder fish (also called a Comet) and not a fancy fish.); *Id.* at 15 ("Plaintiffs note that Palumbo's changing version of fancy fish v. feeder fish is an important discrepancy […] Ms. Palumbo telling the store manager, Mrs. Tyler, that the sale was involving a more expensive "fancy" fish was liable to lead to less questions about the denial.); *Id.* at 12 ("[T]his case is a failure to sell a moderately priced goldfish, no more than $35, but many ranging $6 or less…").)

862, 879 (6th Cir.) ("Because [defendant's] burden is one of production, not of persuasion, we must accept [defendant's] stated reason…").

### c. Pretext

Plaintiffs seem to rely on comparator evidence—that a white customer purchased "feeder" fish meant as food for another pet—as well as Ms. Palumbo's alleged violation of PetSmart's policies and procedures, to show pretext. (Doc. No. 20-1 at 13-15.) Defendants dispute that another customer was in the store at the same time and disagree that Ms. Palumbo violated PetSmart policies; in fact, they seem to assert she followed policy by refusing to sell a fish to customer who, in her view, would not care for the fish. (Doc. No. 19-1 at 17-18.)

To rebut a legitimate non-discriminatory reason in the context of summary judgment, a plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the [defendant's] articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the [defendant's] action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). Put another way, a plaintiff may meet their burden by showing a defendants' proffered reason is suspect. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

Unlike in an employment case, where a plaintiff-employee and defendant-employer have interacted over a longer period and there is a record of employee qualifications or employee performance, this claim centers entirely on the denial of sale during the two to five minute interaction between Ms. Faulckes, F.F. and Ms. Palumbo, who had no prior or subsequent interactions. *See Singh*, 1999 WL 374184, at *7 ("it is the perception of the decisionmaker that is relevant").

If the factfinder were to accept Ms. Faulckes' testimony that Ms. Palumbo would not sell her and F.F. the same kind of fish sold to a Caucasian customer, and that, in doing so, Ms. Palumbo did not follow the PetSmart's HEAR/HEART policy, the factfinder could infer the denial of sale was based soley on race because Ms. Faulckes' testimony is that Ms. Palumbo did not know anything about her, beyond her race. Therefore, accepting Plaintiffs' factual allegations, a reasonable factfinder could disbelieve Ms. Palumbo's testimony, and therefore disbelieve Ms. Palumbo had any knowledge of the fish's welfare—the legitimate non-discriminatory reason. At trial, the factfinder will weigh Ms. Faulckes' testimony against Ms. Palumbo's testimony, and, in reaching a verdict, will make a credibility determination to accept one version of events over the other. The Court cannot weigh the testimony. Accordingly, summary judgment cannot be granted.

### B.  Intentional Infliction of Emotional Distress

Defendants request Ms. Faulckes' and F.F.'s claims for international infliction of emotional distress be dismissed, arguing, as a matter of law, Plaintiffs' allegations are not outrageous. (Doc. No. 19-1 at 19.) Plaintiffs respond Ms. Palumbo's "repeat[ed] use of the phrase 'you people won't take care of the fish," was "extreme". (Doc. No. 20-1 at 17-18.)  Bound by state law, the Court finds "you people won't take care of the fish," accompanied by a denial of service, does not meet Pennsylvania's threshold for extreme and outrageous conduct.

To establish intentional infliction of emotional distress, Pennsylvania law requires (1) the conduct must be extreme and outrageous; (2) it must be intentional or reckless; (3) it must cause emotional distress; (4) that distress must be severe. *Hoy v. Angelone*, 691 A.2d 476, 482 (Ps. Super. Ct. 1998). "The availability of recovery [for intentional infliction of emotional distress] is highly circumscribed." *Kazatsky v. King David Mem'l Park, Inc.*, 527 A.2d 988, 991 (Pa. 1987).

It "has been found only where ... the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'outrageous.'" *Hunger v. Grand Cent. Sanitation,* 670 A.2d 173, 177 (Pa. Super. 1996); *see also Hoy* 720 A.2d at 754 (summarizing examples, including "defendant, after striking and killing plaintiff's son with automobile, and after failing to notify authorities or seek medical assistance, buried [the] body in a field where [it was] discovered two months later and returned to parents") (citing *Papieves v. Lawrence,* 263 A.2d 118 (Pa. 1970))).

Defendants urge the Court to find Ms. Palumbo's conduct was not outrageous.[7] (Doc. No. 19-1 at 19.) Plaintiffs respond the use of "you people won't take care of the fish," coupled with the denial of service, refusal to involve a manager, and service of white customers amounts to an "extreme infliction of emotional distress," by exacerbating Ms. Faulckes' "pre-existing mental issues." (Doc. No. 20-1 at 17-18.)

Several federal and states decisions have concluded that neither explicit nor tacit racial discrimination satisfies the extreme and outrageous prong. *Nichols v. Acme Mkts., Inc.*, 712 F. Supp. 488, 495 (E.D. Pa. 1989), *aff'd*, 902 F.2d 1561 (3d Cir. 1990) ("Racial discrimination alone, like sexual harassment alone, does not state a claim for intentional infliction of emotional distress."); *Davis v. Solid Waste Servs., Inc.*, 20 F. Supp. 3d 519, 526-27, 537 (E.D. Pa. 2014), *aff'd*, 625 F. App'x 104 (3d Cir. 2015) (finding, where supervisor accused of racial

---

[7] Defendants also argue "a plaintiff must suffer some type of resulting physical harm due to the defendant's [sic] outrageous conduct." (Doc. No. 19-1 at 18.) However, mental harm, as here, is sufficient to satisfy this element. *See Weaver v. O'Connor*, No. 1291 WDA 2013, 2014 WL 10936773, at *4 (Pa. Super. Ct. May 28, 2014) ("[S]ymptoms of severe depression, nightmares, stress and anxiety, requiring psychological treatment, and ... ongoing mental, physical and emotional harm sufficiently stated physical manifestations of emotional suffering to sustain a cause of action for intentional infliction of emotional distress.") (quotations and citations omitted).

14

discrimination in workplace, including use of profane and derogatory comments, that no reasonable jury could find, as a matter of law, these circumstances amounted to outrageous conduct); *Coney v. Pepsi Cola Bottling Co.*, No. 97-2419, 1997 WL 299434, at \*1 (E.D. Pa. May 29, 1997) ("Although the alleged statements and discriminatory conduct are unquestionably reprehensible, the cases in our district have consistently held that highly provocative racial slurs and other discriminatory incidents do not amount to actionable outrageous conduct."); *Dawson v. Zayre Dep't Stores*, 499 A.2d 648, 651 (Pa. Super. 1985) (holding, where department store employee called customer a highly offensive racial epithet, it was "not so extreme and outrageous as to give rise to a cause of action for intentional infliction of emotional distress").

Most recently, the Pennsylvania Superior Court re-examined *Dawson*, finding, in the absence of intervening Pennsylvania Supreme Court or legislative action, it remains controlling. *John v. Philadelphia Pizza Team, Inc.*, 209 A.3d 380, 385-6 (Pa. Super. Ct. 2019) ("In the 34 years since this Court decided *Dawson*, there has been only one instance of negative treatment by a court in this Commonwealth [in *McClease v. R.R. Donnelley & Sons Co.*, 226 F.Supp.2d 695, 703 (E.D. Pa. 2002)]"). The *John* panel addressed *McClease* which held "[w]e hesitate to predict that the Pennsylvania Supreme Court would hold that racial epithets and harassment can never be the basis of an IIED claim under Pennsylvania law." *Id*. (*quoting McClease*, 226 F.Supp.2d 695 at 702-03). The Superior Court noted Pennsylvania state courts, the binding authority in tort, have not questioned *Dawson*, and repeated racial comments in the employment context, as in *McClease*, are "factually distinguishable" from pizza parlor employee calling a customer a racial epithet. *Id*.

15

Relying on this guidance, the Court finds summary judgment is appropriate as to Ms. Faulckes' and F.F.'s intentional infliction of emotional distress claim.[8] Plaintiffs admit Ms. Palumbo did not mention race during the interaction. (Doc. No. 19-3 at 48.) As this claim is governed by Pennsylvania state law, and heeding the decisions of Pennsylvania courts in *Dawson* and *John*, the Court finds Plaintiffs cannot show, as a matter of law, that their allegations meet the "extreme and outrageous" standard. This is true when compared to cases where highly offensives racial epithets were found to not be extreme or outrageous, and where this case contains no explicit reference to race. Therefore, summary judgment is granted as to this claim.

---

[8] Plaintiffs do not respond to Defendants' summary judgment motion as to F.F., and the request is therefore unopposed. (Doc. No. 19-1 at 19 ("[U]nder the circumstances of the [encounter] between Plaintiffs and Ms. Palumbo, as described by Plaintiff, there is nothing […] such that a viable claim for intentional infliction of emotional distress can be found…."); Doc. No. 20-1 at 17 (responding only that "Plaintiff Marguerite Faulckes experienced an intentional infliction of emotional distress).) Additionally, as Plaintiffs themselves emphasize, "there is a requirement for expert testimony in an [intentional infliction of emotional distress] case." (Doc. No. 20-1 at 17 (citing *Kazatsky v. King David Memorial Park, Inc.*, 515 Pa. 183 (1987).) Plaintiffs have not presented any evidence that F.F. suffered severe emotional distress, nor have they proffered any expert testimony as to the effect of the interaction on F.F.

**C. Negligent Infliction of Emotional Distress[9]**

Defendants move for summary judgment as to Ms. Faulckes' and F.F.'s negligent infliction of emotional distress claims, asserting the facts at issue do not fit into one of the four highly circumscribed situations which make a negligent infliction of emotional distress claim viable. (Doc. No. 19-1 at 19-20.) Plaintiffs disagree, arguing Ms. Faulckes and F.F., as customers were entitled to "a high duty of care" and had a "special relationship" with PetSmart. (Doc. No. 20-1 at 20.) The Court agrees with Defendants that none of the four factual circumstances are implicated here.

A plaintiff must prove the following elements to sustain this claim:

(1) the defendant was negligent;

(2) the defendant's negligence placed the plaintiff in danger of physical impact or injury;

(3) the plaintiff suffered emotional distress as a result of defendant's negligent conduct

---

[9] In their response to Defendants' Summary Judgment Motion, Plaintiffs seem to attempt to add a claim of negligence per se: "the complaint sufficiently alleges negligent conduct to raise the issue or [sic] negligence per se." (Doc. No. 20-1 at 16, 21 ("[Plaintiff Kurt Clawson's] claims should survive under one or more theories of tort recovery, including IIED, NIED, and negligence per se.").) Under Pennsylvania law, a negligence per se claim requires an underlying cause of action for negligence. *Zaborowski v. Hosp. Care Ctr. of Hermitage, Inc.*, 60 Pa. D. & C.4th 474, 482 n.7 (Com. Pl. 2002); *Ramalingam v. Keller Williams Realty Grp., Inc.*, 121 A.3d 1034, 1042 (Pa. Super. Ct. 2015).

Plaintiffs argue "this case raises, given the statutory context of Section 1981, a negligence per se claim." (Doc. No. 20-1 at 15-16.) For support they cite *Burns v. SeaWorld Parks & Entertainment, Inc.*, but fail to note the plaintiffs, in that case, brought negligence claims. (*Id.* (citing 675 F. Supp. 3d 532, 537 (E.D. Pa. 2023) ("They bring claims against SeaWorld under 42 U.S.C. § 1981, which prohibits racial discrimination in the making and enforcing of contracts, and for negligence.").) Plaintiffs' complaint does not state a claim for negligence or negligence per se. (Doc. No. 1-5.) While they bring two counts of negligent infliction of emotional distress, which requires a showing of negligence, that predicate finding is not the same as a distinct claim of negligence. *See Brown v. Philadelphia Coll. of Osteopathic Med.*, 760 A.2d 863, 868 (Pa. Super. Ct. 2000) ("absent a finding of negligence, the negligent infliction of emotional distress claim cannot survive") (citations omitted). Plaintiffs are reminded they "may not expand [their] claims to assert new theories for the first time in response to a summary judgment motion." *Ward v. Noonan*, 147 F. Supp. 3d 262, 280 n.17 (M.D. Pa. 2015).

*Gillespie v. Pennsylvania State Police*, 574 F. Supp. 3d 272, 287 (E.D. Pa. 2021) (citing

Pennsylvania Model J. Instructions § 13.40). Once these elements are established, the claim is

further limited to four circumstances:

> (1) situations where the defendant had a contractual or fiduciary duty toward the plaintiff;
>
> (2) the plaintiff was subjected to a physical impact;
>
> (3) the plaintiff was in a zone of danger, thereby reasonably experiencing a fear of impending physical injury; or
>
> (4) the plaintiff observed a tortious injury to a close relative.

*Weiley v. Albert Einstein Med. Ctr.*, 51 A.3d 202, 217 (Pa. Super. Ct. 2012).

Defendants highlight none of the four scenarios are implicated here. (Doc. No. 19-1 at

19-20.) Plaintiffs do not identify which of the four circumstances exist and instead argue Plaintiff

was a "business invitee entitled to the highest standard of care in Pennsylvania and […] owed a

statutory duty of service under Section 1981." (Doc. No. 20-1 at 20-21.) In doing so, Plaintiffs

rely on a plurality decision from the Pennsylvania Supreme Court which held negligent infliction

of emotional distress can be maintained, in the absence of physical impact, where "there is an

implied right of care for the plaintiff's emotional well-being on the part of the defendant." (*Id.* at

20-1 at 20-21 (citing *Toney v. Chester Cnty. Hosp.*, 36 A.3d 98 (Pa. 2011).)[10]

At the outset, the Court notes the *Toney* plurality addressed the tort's application to *pre-*

*existing* fiduciary or contractual relationships. *Toney*, 36 A.3d 83, 117 ("[P]re-existing

---

[10] As one District Court observed, "[the] Pennsylvania Supreme Court in *Toney* issued an evenly-split plurality decision […] finding the plaintiff can state a claim for negligent infliction of emotional distress under a "special relationship" theory [and] while persuasive, *Toney* is not binding." *Rideout v. Wells Fargo Bank N.A.*, No. 21-3326, 2021 WL 4902344, at *11 (E.D. Pa. Oct. 21, 2021).  Further, "[u]nder Pennsylvania law, [w]hile the ultimate order of a plurality opinion; i.e. an affirmance or reversal, is binding on the parties in that particular case, legal conclusions and/or reasoning employed by a plurality certainly do not constitute binding authority." *Id.* at *11 n.99 (citing *In Interest of O.A.*, 717 A.2d 490, 496 n.4 (Pa. 1998)).

18

relationships [involve] duties that obviously and objectively hold the potential of deep emotional harm in the event of breach, [such as] relationships involving life and death.”). Subsequent decisions have further clarified that “*Toney* makes clear that Pennsylvania courts must take care not to define special relationships too broadly.” *Boddie v. Cardone Indus., Inc.*, No. 20-2179, 2020 WL 5369472, at *7 (E.D. Pa. Sept. 8, 2020), *aff'd*, No. 20-3058, 2021 WL 4814770 (3d Cir. Oct. 15, 2021). Notably, other courts have declined to extend special relationships to include a customer and store. *Lamb v. CVS Health*, No. 21-638, 2022 WL 541611, at *3 (E.D. Pa. Feb. 23, 2022) (where drug store destroyed family home videos, without any allegation drug store knew contents of videos, “Plaintiff's NIED claim must be considered a traditional relationship between a business and its customer.”); *Shulick v. United Airline*s, No. 11-1350, 2012 WL 315483, at *7 (E.D. Pa. Feb. 2, 2012) (finding special relationship did not exist between airline customer and baggage handler).

The Court disagrees with Plaintiffs' argument for several reasons. First, like in *Lamb*, there is no suggestion that the relationship between a pet store and a customer is the kind of life and death special relationship described in *Toney*. *See Kovalev v. Lidl US, LLC*, 647 F. Supp. 3d 319, 347 (E.D. Pa. 2022) (“A plaintiff cannot form a special relationship with a corporation that merely produces or sells a product.”) Second, Plaintiffs cites no authority for the proposition that § 1981 creates a common law duty not to discriminate. *See also Arguello v. Conoco, Inc.*, No. 97-0638H, 1997 WL 446433, at *2 (N.D. Tex. July 21, 1997) (“Federal statutes cannot, as a matter of law, create a common law duty”). Third, and finally, Plaintiffs are correct that business invitees are owed the highest duty of care, but omit “of entrants upon land.” *Shellenberger v. Kreider Farms*, 288 A.3d 898, 908 (Pa. Super. Ct. 2023). That a business owes its customers a duty to protect them from physical harm does not, by itself, create the kind of special relationship

19

centered on emotional harm which is necessary to maintain an action for negligent infliction of emotional distress. Therefore, summary judgment is granted as to Ms. Faulckes' and F.F.'s claims of negligent infliction of emotional distress against Defendants.

### D. Loss of Consortium

Finally, Defendants asserts that, because the antecedent claims fail, the derivative loss of consortium claim should also fail. (Doc. No. 19-1 at 20); *see also Sease v. Dobish*, No. 1968 MDA 2011, 2013 WL 11282811, at *10 (Pa. Super. Ct. Feb. 21, 2013) ("[w]hen the primary tort claims are dismissed, the loss of consortium must be dismissed as well.") As the precedent torts claims have been dismissed, Defendants are correct. *See also Manelski v. Tinicum Twp.*, No. 07-1487, 2007 WL 9807442, at *5 (E.D. Pa. Dec. 19, 2007) ("The Third Circuit has not addressed whether a plaintiff may bring a loss of consortium claim pursuant to federal civil rights statutes, but the weight of authority holds they may not."); *Burrell v. AT&T Corp.*, No. 03-2490, 2005 U.S. Dist. LEXIS 23872, at *12 (S.D.N.Y. Oct. 14, 2005) ("Plaintiff also makes a claim under section 1981 for loss of consortium, but section 1981 cannot support such a claim.") Accordingly, summary judgment is granted as to Mr. Clawson's loss of consortium claim.

### IV.    CONCLUSION

For the aforementioned reasons, Defendants' Motion for Summary Judgement is granted in part and denied in part. Plaintiff Marguerite Faulckes' and Plaintiff F.F.'s, by and through her parent/natural guardian, Danielle Chappell, claims for violation of section 1981 remain, and all other claims are dismissed. A separate order follows.

BY THE COURT:
*s/ Pamela A. Carlos*
PAMELA A. CARLOS
U.S. Magistrate Judge

20